The bill further stated that Lucas was indebted to the complainants in the sum of $5,000 by bond; and to secure this debt, he conveyed the lot before mentioned, in trust, to satisfy the same; and the trustees, in pursuance of their authority, sold the same, when the complainants became the purchasers, and took a deed in fee simple from the trustees.
The bill further stated that the sheriff of Wake had neglected to make a deed to Lucas at the time of his purchase under the execution of Hodges, and that Alexander Lucas died without ever obtaining any conveyance from the sheriff; that Moore, in his lifetime, and Bowden, his executor, since his death, had received from the rents and profits of said lot large sums, which not only kept down the interest, but nearly extinquished the principal.
That in 1814 the defendant Stewart, pretending to have purchased the interest of Moore for a valuable consideration, and to be assignee of the same, or pretending to be agent for Bowden, the executor, or Archibald Moore, the heir at law, entered upon and hath ever since continued to occupy the premises, receiving therefrom large rents and profits, whereby the whole debt has been extinguished. That the complainants had often applied to the sheriff for a deed, and to Bowden, Archibald Moore, and Stewart, the defendant, in a friendly manner, exhibiting to them their title, and requesting them to come to an account and settlement (258) *Page 112 
of what remained due on the mortgage, which requests were denied on divers pretenses; and complainants now offer in their bill to pay whatever may be due on the mortgage, and pray to be permitted to redeem.
The defendant Stewart submitted whether, under the facts disclosed by complainants, they could be permitted to redeem, and stated in his answer that Casso in 1800 became indebted to Moore in the sum before mentioned, and executed the mortgage deed as set forth in the bill; that Moore was under the impression and belief that there were liens on the lot prior to his, particularly one held by Hamilton, the British agent, and he accordingly purchased Hamilton's claim for $1,100; that Moore died as stated in the bill, having devised the lot to Archibald Moore, his son; and that Casso continued in possession of the premises until 1808, when he left the State, his wife and family still remaining in possession; that in 1811 Casso died, and his family continued in the occupation of the lot until 1814, when Archibald Moore came to Raleigh to adjust the claim against Casso; that Mrs. Casso, the widow, applied to the Hon. H. Potter, as her friend, to liquidate the account, and accordingly he and Archibald Moore did settle the account, and ascertained the balance up to June, 1814, to be $4,178, due Moore; that Moore was anxious to close the business, but expressed his desire to consult the convenience of Mrs. Casso; that Mrs. Casso, whose daughter Stewart had married, seemed much distressed, and entreated the defendant to advance the sum found to be due on the mortgage; that her friends joined in her solicitations; but this defendant declared his inability to raise so large a sum, when Archibald Moore, influenced by feelings of kindness towards Mrs. Casso, agreed to release a part of his claim, and consented to receive $3,500, which the defendant Stewart paid him, and Moore then executed a deed to Mrs. Casso and her heirs for the lot; that not long after Mrs. (259) Casso conveyed the lot to Stewart, but that she remained in possession as the tenant of Stewart until 1817, with the exception of a storehouse which Stewart placed on the lot in 1814, the actual possession of which, by himself or his tenants, Stewart had had for more than seven years; that Lucas, immediately after Mrs. Casso's death, took possession of the dwelling-house, and kept it until he died. Defendant admitted the sale under the execution of Hodges, and the purchase by Lucas, but averred that the purchase was avowedly made, not for the benefit of Lucas only, but of all the heirs of Casso. Defendant admitted the purchase by complainants at the sale under the deed of trust, and affirmed that complainants had then full knowledge of the moneys advanced by this defendant; that the money advanced by this defendant in discharging encumbrances and in necessary repairs on the lot amounted to $9,469.44; that he had received for rents and profits $1,981.31. *Page 113 
Defendant, further answering, said that complainants had applied to him for a settlement; that he gladly assented thereto, and offered to relinquish all claim upon receiving his money advanced, with interest thereon; that T. P. Devereux and J. F. Taylor, esquires, were selected to settle the accounts, and Mr. Taylor, after the settlement, reported the balance due this defendant to be $6,889.19; that the complainants admitted it to be correct, and promised to secure the payment thereof to this defendant by a promissory note; that complainants requested this defendant to make a draft for a deed of conveyance, which he did; but on the day appointed for the execution of the deed and receiving the note, the complainant Henderson informed the defendant that the matter should be settled by a court of equity, declining closing the business, and filed the present bill.
At a former term it was referred to the clerk and master to take (260) an account of the moneys due on the mortgage, of moneys due the defendant Stewart for advances made to relieve the mortgage, and for improvements of a permanent and substantial nature put on the mortgaged premises, and generally of all matters of accounts involved in the cause.
The clerk and master, among other matters, reported that Moore paid to Thomas Hamilton Co. $1,080.35 on 4 February, 1802, in the purchase of a prior claim with which the lot was encumbered; and he charged the mortgaged premises with this sum and interest, and credited Stewart by the same amount.
Further he reported that the mortgaged premises were bound for the interest on the sum due from Casso to Moore from 23 December, 1803, the time fixed in the mortgage for the payment of the money, though the mortgage deed was executed 23 December, 1800. He reported, also, the value of the improvements made by Stewart at $2,500.
To the report exceptions were filed for that the money paid to Hamilton Co. should not be taken into account, and could not be tacked; also, for that the improvements put on the mortgaged premises were valued at more than they were worth.
From the testimony in the cause it appeared that Casso had contracted for the purchase of the lot from one Alford, and gave his bond for the purchase money, but received no title from Alford; he afterwards mortgaged the lot to Moore, and Hamilton became assignee of the bond given to Alford.
Without deciding on the right of the mortgagee to tack to the mortgage money other demands of a personal nature which *Page 114 
he may have against the mortgagor, and if he can as against the mortgagor, whether such right is extended against an assignee for (261) value of the equity of redemption, and whether a purchaser of the equity of redemption at a sheriff's sale is such an assignee, I am very clearly of opinion that the mortgagor Moore has, in this case, the right of tacking the money paid to the Hamiltons; because I think it was an encumbrance and a lien on the land, and which prudence dictated to him to remove to give efficacy to the mortgage.
I give no opinion whether the purchase money after title is made, forms such lien; but I think it clearly does where title is not made, unless it appears that such lien was not relied on or abandoned; as if by the agreement title was to be made at a period before the purchase money became due. In this case it appears from the evidence, that Casso, the mortgagor, had contracted with Alford for the purchase of the lot, which he afterwards mortgaged to Moore; that he gave his bonds for the purchase money, with John G. Blount as security, but did not receive title to the land; that these bonds were transferred by Alford to the Hamiltons. Casso could not compel Alford to make title until these bonds were paid off. Moore, therefore, by paying off these bonds, destroyed this equitable lien and enabled Casso to call for the legal title. It was done for Casso's benefit; it thereby enabled Casso to fulfill his warranty to Moore. This exception must, therefore, be overruled.
I think the clerk erred in not allowing interest from the date of the deed, notwithstanding the deed calls for only the net sum at the end of three years, for the parties treated the contract as a conditional sale, and the rents were to come in lieu of interest; but the parties in 1814, and this Court now, considers it only as a security for money. Moore should, therefore, have interest on his money then due.
Although, under ordinary circumstances, the assignee of the mortgagee should stand in his place, and must submit to a redemption upon the same terms, and though, in general, it be true that it is no defense (262) for him to say that the payments or other deductions claimed by the mortgagor do not appear upon the papers, because it is enough that it appears that it was redeemable, and it was his own act to purchase, and he might have informed himself, for the assignment only substitutes him to the mortgagee, yet there are cases where the sum really paid by the assignee shall be paid before a redemption shall be allowed, even when the mortgagor has been entirely passive. When he has lent his aid to swell the amount, there is no doubt that such will be the case. Such cases are when the mortgagor is an infant, or perhaps a feme covert, and is about to be turned out of possession, or to suffer injury, and one as a friend, and in order to preserve the mortgagor's rights and save him from injury, bonafide, advances money; and in this case, but *Page 115 
for the assignee's taking an absolute deed to himself and in his answer denying the right of the heirs to redeem, I think this would have been such a case; the more especially as he paid several hundred dollars less than the respectable gentleman who drew the mortgage deed reported to be due, after having examined the case as the friend of and at the request of the widow; but his taking an absolute deed and denying the right of redemption shows too strongly that he was not acting on the part of or in behalf of the heirs of the mortgagor, but for his own benefit; he must, therefore, stand upon the rights of the mortgagee. I should have mentioned above, in addition to the circumstances there stated, that Casso had left his wife and children without affording them means of redemption, or any other place of residence, and I regret very much that I am compelled to view the assignee as acting for his own benefit and not for that of the heirs; but I am not satisfied how the report of the master differs so much from the gentleman who settled the account in 1814. Justice requires, I think, that we should be informed, if possible, of the items of that settlement; I think the case should be referred to the master to ascertain them. (263)
I think that the master erred in fixing the value of the improvements; the evidence warrants no further than $1,800 at most. If the master went to the grounds that the improvements yield annually such a sum as, according to common calculations, requires an expenditure of $2,500 to be made, he overlooks the ground rent, which belongs to the mortgagor. As to the assignee standing (in ordinary cases) in the place of the mortgagee, I think that the rule is as laid down by Lord Roslyn and approved of byLord Eldon; he can claim no greater rights; and that the rule laid down byLord Kenyon is fallacious, for although he has the law on his side by obtaining the legal title from the mortgagee, he had not equal equity; he is not a purchaser without notice, for his title being for the security of money, he is thereby put upon inquiry as to the sum due; and that which puts a person on inquiry is sufficient notice.
There is another and very important point which I wish to have brought before the Court. It is alleged in the answer and supported by proofs; and that is, whether Lucas did not become, upon his purchase, a trustee for the heirs of Casso. I wish that question to be reserved and spoken to.
The other judges concurred in the opinion of Judge Henderson, and it was decreed that the lot be sold by the master, reserving the cause for further consideration of the points on which his Honor, Judge Henderson, expressed a wish for further examination.
Cited: Pullen v. Mining Co., 71 N.C. 567. *Page 117